# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED:  MARCH 14, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0551-MR

DUSTIN BELL                                                     APPELLANT

V.                   ON APPEAL FROM GARRARD CIRCUIT COURT
HONORABLE HUNTER DAUGHERTY, JUDGE
NO. 20-CR-00060

COMMONWEALTH OF KENTUCKY                    APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Dustin Bell was convicted by a Garrard County jury of murder and first-degree assault.  He received a total sentence of life imprisonment and appeals to this Court as a matter of right.[1]  Bell argues the trial court erred by:  (1) failing to instruct the jury on defense in protection of another; (2) admitting recorded jailhouse phone calls which contained hearsay; and (3) denying his motion for a mistrial after the Commonwealth's key witness had a seizure during cross-examination.  We affirm.

For several years, Bell, Samantha Denny, and Rodney Meade were friends.  Bell and Denny began dating in December 2019 and were engaged to

---

[1] Ky. Const. § 110(2)(b)

be married in February 2020.[2]  They lived together at Bell's residence.

Sometime on July 21 or 22, 2020, Bell and Denny had an argument because

she did not want him looking through her cellphone.  During the argument,

Bell broke the cellphone which angered Denny, so she left.  She eventually

went to stay at Meade's residence.[3]

Initially, Bell did not know where Denny went and actively tried to find

her.  He messaged Meade on social media inquiring about Denny's

whereabouts.  Meade intimated he knew about the fight and that Denny was

"done" with Bell.  While Meade denied being with Denny, Bell told Meade that

he suspected they were involved romantically.  Bell also stated he knew Denny

had been at Meade's residence.

On the morning of July 24, 2020, Bell went to Meade's residence to look

for Denny.  Because the door was locked, Bell used a card to slide the door

open—a trick he claimed Meade had previously showed him.  Meade was in his

downstairs bedroom.  Bell asked about Denny.  At the time, Denny was hiding

under the pool table in Meade's basement.  Bell and Meade continued talking

without argument for over an hour and eventually went outside to Meade's

mailbox where they continued talking.  When they returned to the house,

Denny was in the kitchen.  She began yelling at Bell and asked him what he

wanted.  Bell stated that he wanted her to come home with him.  Denny told

---

[2] Bell often referred to Denny as his wife, but it does not appear from the record they were actually married at any time relevant to this case.

[3] Meade shared the residence with his father, who owned the property and often stayed overnight in West Virginia during the week for work.

Bell she did not want to go with him and asked him to leave. She also demanded that Meade ask Bell to leave. It is unclear whether Meade told Bell to leave, but he did tell Denny that she did not have to leave with Bell.

Bell did not leave. Meade grabbed a knife off the kitchen counter. Denny testified Meade simply grabbed the knife and stood his ground while Bell claimed Meade moved towards him. Denny got between the two men with Meade to her back and Bell in front of her. Bell stated that Denny was going with him. Meade again told Denny she did not have to leave and further stated he was not going to fight with Bell. Suddenly, Bell pulled out his handgun. As he shot at Meade, Denny took a protective stance. The bullet hit three of Denny's fingers before striking Meade in the hip.

Denny did not know she had been shot and began fighting Bell. Meade told them he had been shot and fell to the floor. Denny told Meade she would get help and told him not to worry about her. Bell and Denny then left the house, leaving Meade behind. Once they were in Bell's car, Denny realized she had been shot in the right hand. On the way to the hospital, Bell's car broke down and they waited for a tow truck. The tow truck took them to a garage where Bell's mother and brother picked them up. On the way to the hospital, Denny demanded to get out of the vehicle and began walking. Bell walked with her to the hospital but could not go inside because of COVID-19 regulations.

In the meantime, Meade's body was discovered by his brother Brad who called 911 although he knew Meade was already dead. Police discovered a single bullet casing and a knife at the scene. Officers then went to Bell's

3

residence to execute a search warrant and recovered Bell's firearm from his vehicle.

Hospital personnel reported Denny's gunshot wound to law enforcement. Police officers made contact with Bell in the parking lot of the emergency room. Bell told the officers he had picked Denny up at her friend's house and that she was already injured when he arrived. He also claimed Denny would lie to get him in trouble. Bell admitted at trial that he lied to the officers. The police took Bell to the station for further questioning.[4] He initially repeated his fabricated story that Denny was already injured when he came to pick her up before eventually claiming self-defense. Again, Bell admitted at trial that he lied to the police during this interview prior to telling them the truth about the necessity for self-defense.

---

[4] The portion of the Commonwealth's statement of the case describing Bell's recorded interview contains a general citation to the video record between 10:50:30-02:50:45 without any subsequent pinpoint citations. The use of "*id.*" without further specifying information is not appropriate in this situation. Kentucky Rules of Appellate Procedure (RAP) 31(E)(4) requires "[e]ach reference in a brief to a segment of the designated official recording shall set forth the letters 'VR' and the month, day, year, hour, and minute (or second if necessary) at which the reference begins as recorded." Similarly, RAP 32(A)(3) requires a statement of the case to contain "ample references to the *specific* location in the record supporting each of the statements contained in the summary." (Emphasis added). The foregoing rules pertain to appellee briefs as well as appellant's briefs. RAP 32(B)(3) ("A counterstatement of the case [must] . . . set[] forth the matters the appellee considers essential to a fair and adequate statement of the case in accordance with the requirements for appellant's statement of the case."). Kentucky appellate courts "will not sift through a voluminous record to try to ascertain facts when a party has failed to comply with its obligation under [our rules of procedure] . . . to provide specific references to the record." *Commonwealth v. Roth*, 567 S.W.3d 591, 595 (Ky. 2019) (quoting *Parker v. Commonwealth*, 291 S.W.3d 647, 676 (Ky. 2009)). We again implore appellate practitioners to scrupulously comply with the applicable rules to avoid the imposition of sanctions up to and including dismissal. *Id.* at 596.

Bell was indicted on charges of murder, first-degree burglary, and first-degree assault. He testified in his own defense at trial variously claiming Denny had swatted his gun causing it to accidentally discharge and that he intentionally shot Meade in self-defense. At the conclusion of the evidence, the trial court granted a directed verdict of acquittal on the burglary charge. Bell was convicted of murder and first-degree assault. The trial court imposed a total sentence of life imprisonment in accordance with the jury's recommendation. This appeal followed.

Bell first argues the trial court erred by failing to instruct the jury on defense in protection of another. He concedes this alleged error is unpreserved and requests palpable error review under RCr[5] 10.26. We decline to review for palpable error because Bell's failure to comply with RCr 9.54(2) forecloses appellate review.

RCr 10.26 generally authorizes an appellate court to review an unpreserved error as follows:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

Palpable error review is generally available to remedy an incorrectly stated instruction that was given to the jury. *Martin v. Commonwealth*, 409 S.W.3d 340, 346 (Ky. 2013). However, RCr 9.54(2) specifically provides

---

[5] Kentucky Rules of Criminal Procedure.

5

> [n]o party *may assign as error* the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

(Emphasis added). In *Martin,* we interpreted RCr 9.54(2) to impose an affirmative duty "on the parties to make their instructional preferences known to the trial judge." 409 S.W.3d at 345. When a party's claim of error "is that a particular instruction should have been given but was not or that it should not have been given but was given," the failure to comply with RCr 9.54(2) bars "appellate review unless the issue was fairly and adequately presented to the trial court for its initial consideration." *Id.* at 346. The reason for this rule is "that the decision to request a specific instruction or to oppose the giving of a specific instruction is often a matter of individual preference and trial strategy." *Id.* at 345. We cannot "expect the trial judge to anticipate a party's strategic preferences and act upon them *sua sponte.*" *Id.* at 346. Similarly, "[t]he trial judge cannot be expected to distinguish a neglectful omission from a deliberate choice." *Id.*

Here, Bell did not specifically request an instruction on the defense of protection of another or otherwise make his desire for such an instruction known to the trial court. The defenses of self-protection and protection of another are distinct and governed by separate statutes. *Compare* KRS 503.050 (self-protection) *with* KRS 503.070 (protection of another); *see also* 1 Cooper & Cetrulo, *Kentucky Jury Instructions* §§ 11.07-11.07A (2023). Additionally, Bell

6

indicated to the court that the first self-defense instruction was "fine."[6]  Thus, his claim that this instruction misstated the law is barred as invited error. *Sanchez v. Commonwealth*, 680 S.W.3d 911, 930 (Ky. 2023) ("By expressly agreeing to the jury instructions . . . [the defendant] waived his ability to now challenge those instructions on appeal.").  Because we conclude Bell failed to comply with RCr 9.54(2), we decline to address his entitlement to an instruction on defense in protection of another.

Bell next argues the trial court erred by admitting recorded jailhouse phone calls containing hearsay.  We disagree.

The Commonwealth called a former employee of the Lincoln County Regional Jail to lay the foundation for introduction of four recorded phone calls.  Two of the calls were between Bell and his mother while the other two were between Bell and Denny.  After the foundation was laid, Bell objected on hearsay grounds pertaining to Denny's side of the conversation.  Without articulating a specific ground for admission, the Commonwealth responded that the trial court could give an admonition.  The trial court agreed and instructed the jury that

> statements made by the defendant are always admissible.  There will be some other information that's being conveyed by the other individuals he's talking to.  Those statements are not being introduced for their truth.  Somebody else could be saying something else within those statements and it is not to be considered by you as true.  Those are hearsay.  Only ones made by the defendant can be considered by you as evidence in this case.

---

[6] This instruction was labeled as Instruction No. 3.

7

The recordings were then played for the jury. The gist of the conversations between Bell and his mother involved Bell's request for her to marshal Denny's support for his defense, including his desire for Denny to swear in an affidavit that she pushed the gun because that was "the only way it's going to seal my . . . freedom."

In her conversations with Bell, Denny described the extent of her injuries. Bell apologized and told her he did not mean to shoot anyone. He also expressed his hope the jury would rule in his favor on his claim of self-defense. Denny derided the notion of Bell asserting self-defense and exclaimed, "It's not self-defense," and "You godd--n murdered him." She told Bell she hated him because of the physical and mental trauma she experienced. Denny further exhorted Bell to tell the truth, to which he responded, "What do you want me to have, life?" After the recordings were played for the jury, the trial court admitted them into evidence and reiterated its prior admonition that the jury should refrain from considering any statements apart from those made by Bell.

KRE[7] 802 provides "[h]earsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). A statement is defined as (1) "[a]n oral or written assertion;" or (2)

---

[7] Kentucky Rules of Evidence.

the "[n]onverbal conduct of a person, if it is intended by the person as an assertion." KRE 801(a). While the Rules of Evidence do not define an assertion, we have interpreted the term to mean "a statement or expression of a fact, condition or opinion." *Harris v. Commonwealth*, 384 S.W.3d 117, 126 (Ky. 2012). "Thus, not all out-of-court utterances are hearsay." *Id.* at 125.

Specifically, KRE 801A(b)(1) exempts a party's admissions from the scope of the hearsay rule "even though the declarant is available as a witness, if the statement is offered against a party and is . . . [t]he party's own statement, in either an individual or a representative capacity[.]" In contrast to a statement against interest under KRE 804(b)(3)[8], a party admission under KRE 801A(b)(1) "does not at all depend upon the making of a statement that is against the party's interest when made." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.15[1] (2022). The rationale underlying this hearsay exception is that a party "cannot complain of lack of opportunity to cross-examine himself before his assertion is admitted against him." *Id.* (quoting 4 Wigmore, *Evidence in Trials at Common Law* § 1048 (Chadbourn rev. 1972)). In this context, a

---

[8] When a declarant is unavailable as a witness, KRE 804(b)(3) provides for the introduction of

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

party's admissions (sometimes termed "evidentiary admissions") are "merely evidence, subject to rebuttal and contradiction like all other evidence[.]" *Id.* at § 8.15[3][a]. Thus, unlike a judicial admission, an evidentiary admission is not conclusive. *Id.* (citing *Sutherland v. Davis*, 286 Ky. 743, 151 S.W.2d 1021, 1024 (Ky. 1941)).

Bell does not challenge the use of his recorded admissions. Instead, he argues Denny's side of the conversation amounted to inadmissible hearsay. However, this Court has held out-of-court statements used to provide context to a party's admissions on a recording do not constitute hearsay because the statements are not offered for the truth of the matter asserted. *Turner v. Commonwealth*, 248 S.W.3d 543, 546 (Ky. 2008). Further, to the extent Denny's statements were not "reasonably required to place any of [Bell's] statements into context[,]" any inadmissible portions of the recording are subject to harmless error analysis. *Id.*

In the present appeal, the trial court recognized Denny's statements were not being offered for the truth of the matter asserted and twice admonished the jury not to consider them as evidence. We indulge a strong presumption that a jury will "follow an admonition to disregard evidence and the admonition thus cures any error." *Dillon v. Commonwealth*, 475 S.W.3d 1, 18 (Ky. 2015) (quoting *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003)). However, this presumption is not absolute. *Id.* The presumption does not apply:

[1] when the question was asked without a factual basis *and* was 'inflammatory' or 'highly prejudicial'[; or]

[2] when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant.

*Id.* at 18-19 (quoting *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

Contrary to Bell's argument[9], we neither perceive an overwhelming possibility that the jury would be unable to follow the trial court's admonition, nor do we discern a strong likelihood that Denny's statements were devastating to the defense. Bell asserts it would be "difficult for the jury to disregard [Denny's] dismissive view of [Bell's] self-defense claim and her emotional statement that he 'godd[-][-]n murdered' [Meade]." He further claims Denny's statements improperly allowed the jury to hear additional gruesome details about her injuries. However, in considering the efficacy of admonitions, this Court has recognized, "[p]eople disregard what they know or what they think they know all the time." *Bartley v. Commonwealth*, 400 S.W.3d 714, 736 (Ky. 2013).

In the context of this personal phone call, Denny's statements regarding Bell's claim of self-defense evince a layman's understanding of the concept based on her first-hand observations as a victim and eyewitness rather than

---

[9] Bell has not argued the Commonwealth lacked a factual basis to introduce Denny's statements. Thus, the first exception to the curative admonition rule is inapplicable.

11

the expression of a legal opinion arising from specialized knowledge.[10]  Thus, the present circumstances are distinguishable from those where this Court has held a police detective's improper opinion testimony that the defendant's "conduct did not match the stereo-typical conduct of an innocent person acting in self-defense" was devastating to the defense.  *Ordway v. Commonwealth*, 391 S.W.3d 762, 777 (Ky. 2013).  Moreover, as discussed in further detail below, if an admonition is sufficient to cure an improper opinion concerning a defendant's guilt of murder, then we fail to perceive why an admonition would not be equally sufficient to remedy an improper opinion on a claim of self-defense.  *See Kinser v. Commonwealth*, 741 S.W.2d 648, 653 (Ky. 1987).

Regarding Denny's statement that Bell murdered Meade, we have held an admonition was sufficient to cure a detective's improper testimony that he "knew enough about the case to think that [the three defendants] had possibly committed this murder."  *Id.*  Although Denny's statement was admittedly stronger than that in *Kinser*, she also lacked the cloak of authority and expertise which colored the detective's statement in that case.  Further, because of the admonition, the present appeal is distinguishable from our

---

[10] While Bell has not made any claim Denny's statements were testimonial for purposes of Confrontation Clause analysis, we note testimonial statements are generally made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 52 (2004).  Examples of testimonial statements include "affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51 (citation omitted).  We do not find any basis in the present record to indicate the statements contained in this personal phone call were testimonial in nature.

12

decision in *Nugent v. Commonwealth*, 639 S.W.2d 761, 764-65 (Ky. 1982), wherein we held the use of a lay witness's opinion on the issue of the defendant's guilt amounted to reversible error. We cannot conclude Denny's statement was so flagrant as to be devastating or otherwise overcome the jury's ability to follow the trial court's admonition.

Further, Denny's statements describing her injuries were sufficiently similar to her trial testimony as to be merely cumulative. These statements could hardly be considered devastating to the defense when the jury was already aware of the extent of Denny's injuries. Upon consideration of the recorded phone calls in light of the trial court's admonition, we conclude that reversal is unwarranted.

For his final contention of error, Bell asserts he was entitled to a mistrial after Denny had a seizure on the stand during cross-examination. We disagree.

This Court has long held "[a] mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity." *Stieritz v. Commonwealth*, 671 S.W.3d 353, 368 (Ky. 2023) (quoting *Cardine v. Commonwealth*, 283 S.W.3d 641, 647 (Ky. 2009)). For a manifest necessity to exist, "the harmful event must be of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way." *Maxie v. Commonwealth*, 82 S.W.3d 860, 863 (Ky. 2002). We review the denial of a mistrial for abuse of discretion. *Id.* at 863.

In considering the prejudicial effect of a witness's conduct at trial, our predecessor Court observed the "frequent occurrence in homicide cases [where] the next of kin or other close relatives, under the stress of testifying, or when confronted with personal belongings of the deceased, become emotionally upset, cry, and lose their composure." *Jackson v. Commonwealth*, 275 S.W.2d 788, 789 (Ky. 1955). Because "[t]hese are matters that cannot be anticipated and cannot be prevented by denying such persons the right to be present in the courtroom[,]" it is the duty of the trial court, upon a proper request, "to admonish the jury concerning such disturbance." *Id.* The same rule pertains to medical incidents in the courtroom. *See United States v. Bailey*, 675 F.2d 1292, 1297 (D.C. Cir. 1982) (noting the trial court is in the best position to determine the prejudicial effect, if any, resulting from a witness's seizure during cross-examination). Further, when a witness's conduct does not rise to the level of impropriety, it is within the discretion of the trial court "to allow the proceedings to continue." *Miller v. Commonwealth*, 925 S.W.2d 449, 453 (Ky. 1996), *overruled on other grounds by Garrett v. Commonwealth*, 48 S.W.3d 6, 14 (Ky. 2001). Ultimately, "[t]he trial judge [is] in the best position to determine whether any remedial action [is] necessary to preserve decorum and ensure a fair trial." *Id.* (quoting *Wilson v. Commonwealth*, 836 S.W.2d 872, 890 (Ky. 1992)).

In the present matter, Denny testified on direct examination without incident. At the conclusion of direct examination, the trial court informed the parties it was time to break for lunch. The Commonwealth requested the court

14

to allow Denny to complete her testimony without interruption. Defense counsel anticipated cross-examination would last 15-20 minutes. The trial court agreed to permit Denny to finish her testimony. Approximately seven minutes into the cross-examination, Denny became upset and tearful. Denny continued to answer questions when defense counsel asked if Bell was the love of her life. Denny responded, "He still is." Defense counsel then asked, "So [Bell] waited with you because he cared about you?" At this point Denny became visibly distressed, leaning her head back. The Commonwealth objected to the question, which the trial court overruled. Denny then slumped from the witness chair onto the floor. The trial court inquired whether she was alright. The Commonwealth came to Denny's aid and informed the court she was having an epileptic seizure. Other individuals also assisted Denny. After a couple of minutes, Denny regained her composure, sat back up and said, "I want to hurry up and go home and go to sleep." She continued to sit in the witness chair for a few more minutes. Denny did not require medical intervention.

At this point, Bell requested a mistrial arguing the seizure would affect the jury's view of Denny to his prejudice. The trial court stated it was less concerned about the prejudicial impact of the seizure than it was about Bell's right to conduct a full cross-examination. The trial court allowed Denny to continue testifying with the caveat that it needed "to see what she could do from here on out." Denny informed the trial court that she was ready to resume questioning. The remaining cross-examination lasted approximately

15

two minutes. Denny answered every question asked of her. Following her testimony, the Commonwealth requested that Denny be excused. Bell agreed and did not request any further relief.

Under the reasoning of *Jackson* and *Mills*, we cannot conclude the trial court abused its discretion by denying Bell's motion for mistrial. Further, we cannot conclude the denial of a mistrial implicated Bell's right of confrontation. *See Davenport v. Commonwealth*, 177 S.W.3d 763, 767-68 (Ky. 2005) ("[T]he right to cross-examination is not absolute and the trial court retains the discretion to set limitations on the scope and subject: '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). We have held "the Confrontation Clause is not implicated by a witness claiming memory loss if he or she takes the stand at trial and is subject to cross-examination." *McAtee v. Commonwealth*, 413 S.W.3d 608, 619 (Ky. 2013). The reasoning of *McAtee* applies with equal force to the present appeal.

Here, the disturbance in the courtroom was a medical situation, not an impropriety. After the trial court denied his motion for a mistrial, Bell did not request an admonition or otherwise articulate his belief that an admonition would be ineffective. Bell completed his cross-examination and agreed to excuse Denny without her being subject to recall. These circumstances simply do not amount to the manifest necessity for a mistrial as identified by our precedents. *See Stieritz*, 671 S.W.3d at 368.

16

Having carefully reviewed the record, briefs, and the law, we perceive no error. Accordingly, the judgment of the Garrard Circuit Court is affirmed.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Steven J. Buck
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Sarah N. Christensen
Assistant Solicitor General

Rachel Ann Wright
Assistant Solicitor General